**HONORABLE BARBARA J. ROTHSTEIN**

FILED _____ENTERED
LODGED_____RECEIVED

MAR 1 0 2003   KN

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BIANCA FAUST, individually and as guardian of GARY C. FAUST, a minor, and BIANCA CELESTINE MELE,<br><br>Plaintiffs,<br><br>vs.<br><br>BELLINGHAM, WASHINGTON LODGE #493 LOYAL ORDER OF MOOSE, INC., JOHN DOES (1-10) (fictitious names of unknown Individuals and/or entities) and ABC CORPORATION (1-10) (fictitious names of unknown individuals and/or entities),<br><br>Defendants. | CIVIL ACTION NO  C01-1915R<br><br>DECLARATION OF MEREDITH J. HILLMAN |

CV 01-01915  #00000081

Meredith J. Hillman declares and states as follows

1    I am one of the attorneys for defendant Bellingham, Washington Lodge # 493 Loyal Order of Moose, Inc   I am over the age of eighteen and competent to testify from personal knowledge.

2.   Attached hereto as Exhibit 1 is a true and correct copy of the autopsy report prepared by Dr Gary Goldfogel regarding Hawkeye Kinkaid with portions to be excluded pursuant to

DECLARATION OF MEREDITH HILLMAN (C01-1915R )- 1

3568/P/ Declaration of Hillman limine- Faust doc

KINGMAN, PEABODY, PIERSON & FITZHARRIS, P S
ATTORNEYS AT LAW
505 MADISON STREET  SUITE 300
SEATTLE, WASHINGTON 98104
(206) 622-1264

ORIGINAL

1  Defendant's Motion in Limine #8 highlighted

2  3  Attached hereto as Exhibit 2 is a true and correct copy of the curriculum vitae of Fred Del

3  Marva submitted by plaintiffs pursuant to FRCP 26

4  4  Attached hereto as Exhibit 3 is a true and correct copy of the Opinions Report authored by

5  Fred Del Marva on January 17, 2002 (sic?) and received by defendant on January 23, 2003

6  5  Attached hereto as Exhibit 4 is a true and correct copy of the Supplemental Opinions Report

7  authored by Fred Del Marva on February 5, 2003 and received by defendant on February 7,

8  2003

9  I declare under penalty of perjury under the laws of the State of Washington that the

10  foregoing is true and correct to the best of my knowledge

11

12  DATED this ___10___ day of March 2003, in Seattle, Washington

13

14

15  Meredith J Hillman, WSBA #31454

16

17

18

19

20

21

22

23

24

25

DECLARATION OF MEREDITH HILLMAN (C01-
1915R )- 2

3568/P/ Declaration of Hillman limine- Faust.doc

KINGMAN, PEABODY, PIERSON & FITZHARRIS, P S
ATTORNEYS AT LAW
505 MADISON STREET, SUITE 300
SEATTLE WASHINGTON 98104
(206) 622 1264

# Exhibit 1

## WHATCOM COUNTY MEDICAL EXAMINER
### 1500 NORTH STATE STREET
### BELLINGHAM, WA 98225

## AUTOPSY REPORT

### A-29-00

| | |
|---|---|
| **NAME:** | **KINKAID, Hawkeye (NMI)** |
| **AGE:** | **57 (11/14/42)** |
| **DATE OF DEATH:** | **04/21/00 (0445)** |
| **DATE OF AUTOPSY:** | **04/24/00 (0900)** |
| **INVESTIGATING AGENCY:** | **Washington State Patrol** |
| **AUTOPSY PERFORMED AT:** | **Whatcom County Morgue** |
| **AUTOPSY ORDERED BY:** | **Gary Goldfogel, M.D.** |
| | **Whatcom County Medical Examiner** |

### AUTOPSY DIAGNOSIS:

I.   Unrestrained driver in frontal MVA.
    A. Severe anterior blunt chest trauma.
    B. Numerous, complex, bilateral rib fractures.
    C. Complete horizontal sternal fracture.
    D. Bilateral hemopneumothoraces.
    E. Acute fibrinous pericardial hemorrhage associated with pulmonary vein tear.
    F. Bilateral pulmonary contusions.
    G. Multiple superficial liver lacerations.
    H. Partial evulsion and soft tissue hemorrhage of gall bladder
    I. Lateral and medial superficial splenic capsule lacerations
    J. Numerous superficial intimal tears of transverse and early descending aorta
      (deceleration injuries)

II.  Moderate to focally severe three vessel coronary atherosclerosis.
    A. No acute thrombi in coronary vasculature.
    B. No grossly apparent, acute or prior myocardial infarctions

III. Toxicology:
    A. Blood alcohol: 0.09 gm%
    B. Blood drug screen: Negative for drugs tested.
    C. Urine drug screen: No urine available.

1

**CAUSE OF DEATH:**

Terminal exanguination/hemorrhagic shock due to severe, closed, anterior thoracic trauma.

**MANNER OF DEATH:**

Accidental (MVA).

**OPINION:**

This 57 year old Caucasian male was the at-fault driver in a frontal motor vehicle accident. He lost control of his passenger van and crossed the midline striking an on-coming car at substantial speed   He suffered numerous complex injuries in the accident, the majority of which are related to blunt, closed thoracic trauma and expired at the hospital emergency room. Alcohol was found in the vehicle and the decedent had been reportedly drinking heavily at a Bellingham tavern (Moose Lodge). Blood alcohol determination on EDTA anticoagulated blood by St. Joseph's Hospital yields result of 0.16 gm%. Blood alcohol on samples procured at autopsy reveal ethanol quantitating 0.09 gm%. Alcohol intoxication is considered a contributory factor in the accident.

The decedent suffered from known coronary artery atherosclerosis. Consideration is given to the possibility of a "cardiac event" precipitating the accident. The severity of injuries sustained in the crash are lethal. In view of the toxicology, the manner of death is certified "accidental".

**Gary Goldfogel, M.D.**
**Whatcom County Medical Examiner**

GAG:rc

Copies to:       Ferndale Police Department (00F-1734, 0292417)

2

## CLINICAL SUMMARY:

The decedent was the driver and sole occupant of a passenger van travelling southbound in the 5400 block of La Bounty Rd. The decedent apparently lost control of the vehicle and crossed the midline striking a four door automobile in a head on collision. He significantly impacted the steering wheel and dash board in the accident. Open alcohol was found in the decedent's vehicle. Investigation by Ferndale Police reveals that he had been drinking heavily at the Moose Lodge in Bellingham and was reportedly intoxicated when he left the lodge immediately prior to the accident.

The decedent was emergently transported to St. Joseph's Hospital and expired in the emergency department after extensive resuscitation attempt. The body was transported under medical examiner protocol to the county morgue under my direction. Autopsy is performed on 04/24/00 at 0900 hours with Ferndale Police Detective Wetch in attendance.

## IDENTIFICATION:

1.   On the left wrist is a hospital Typenex bracelet PNT 2549.

2   On the right ankle is Washington State Trauma Registration bracelet 0001115.

3   The following professionally made tattoos are found on the decedent. All are photographed.
   A. Blue and black large cloud with a cartoon face resembling a gorilla, on the medial right upper arm.
   B. Green, red and black tattoo of a parrot on the medial right forearm.
   C. Headdress with bird feathers on the posterior right forearm.
   D. Complicated, multicolored bird on the right lateral upper arm.
   E   Black swastika on the anterior proximal right lower arm.
   F. Green and black flower on the superior right lateral upper arm.
   G. Cloud with a central snake and lightening bolts on the left lateral upper arm.
   H. Skull of a cow with an axe attached to the head on the left lateral lower arm.
   I. Multicolored eagle on the medial left lower arm beginning at the antecubital fossa
   J   Stylized red and black bird on the left lateral upper thigh.
   K. Stylized red and black bird on the proximal right lateral thigh in mirror image to that seen on the left.
   L. Feather with a yellow, green and red mushroom and lettering "Amber" on the proximal, medial left lower leg.
   M. Stylized black and green tattoo somewhat resembling an axe on the medial aspect of the right lower leg.

3

## EXTERNAL EVIDENCE OF MEDICAL THERAPY:

1.  Entering the left nostril is an endogastric tube with a small quantity of blood in the lumen.

2.  Entering the left mid portion of the mouth is an endotracheal tube fixed in place with a plastic bite guard.

3.  Plastic stiff-neck cervical collar.

4.  Large bore intravenous catheter in right anticubital fossa with heparin lock.

5.  Disposable ECG monitor pads on the superior right and left shoulders and right and left lower abdomen.

6.  Large bore central venous catheter entering the left anterior subclavian region of chest.

7.  Large bore intravenous catheter entering the left anticubital fossa.

8.  Surgical incision, vertically oriented, 3.5 x 1.5 x 1.0 cm reflecting a cut down site superior to the umbilicus in the midline with a central, protruding, large bore catheter with clamped and cut end.

9.  Foley catheter entering the penis, roughly tied in a knot.  The urine collection device is not attached.

## PERSONAL EFFECTS:

1.  Around the decedent's neck is a woven, silver colored metallic necklace with a silver colored eagle head central pendant.

2.  In the decedent's left earlobe is a single, relatively large, clear colorless stone, post type earring.

3.  $20.00 in US bills and $0.04 in US coin.

4.  Black folding Gerber pocket knife.

5.  Brown wooden pipe.

6.  Gray/brown tobacco pouch.

7.  Silver colored metallic folding pipe knife.

4

8      Yellow and red metallic lighter.

9.     Yellow and silver colored metal lighter.

10.    Reading glasses in a well worn brown leather case.

11.    Pocket knife on a silver colored metallic key chain void of keys.

12.    Pocket watch on a short length, silver colored metallic chain.

13.    Fingernail clippers

14.    Red "Swiss Army" style knife

The above items will all be receipted to Ferndale Police for return to the family.

## CLOTHING:

Accompanying the body are two plastic bags with clothes and the following personal effects.

1      Previously cut, well worn blue denim jeans jacket.

2      Previously cut, well worn, burgundy long sleeve work shirt.

3      Blue nylon midcalf height stockings.

4.     Blue and tan moderately worn, cowboy boots with clean and dry soles

5.     Well worn blue denim Lee jeans.

6      Blue bandana in the left rear jeans pocket.

7.     Brown tooled leather belt with central brass buckle with lettering, "Patience, Integrity, Guts - America's Finest American Police Law and Order" and central "Pig".

## EXTERNAL EVIDENCE OF INJURY:

1.     The entire anterior chest is unstable with palpable underlying rib fractures.

2      Copious quantity of blood exits left nostril without clotting.

5

3       Complex, multidirectional abrasion, distal anterior right knee 4.5 x 4.0 cm.

4       Roughly horizontally oriented superficial abrasions on medial right knee, numbering three and forming a patch 5.5 x 3.9 cm.

5.      Approximately midline, overlying the mid sternum, is a curvilinear red abrasion 2.9 x 0.9 cm

6.      On the anterior/medial proximal right lower leg is a horizontal superficial laceration 1 1 x 0 3 cm surrounded by a horizontal flame shaped abrasion beginning at the laceration and extending medially across the calf 10.2 x 3.5 cm.

7       Roughly elliptical abrasion on the proximal lateral right lower leg 3.2 x 1 9 cm

8       Horizontally oriented superficial laceration in approximately mirror image to that on the right, is seen on the left proximal medial lower leg overlying the tibia and measuring 1 2 x 0 3 cm with a flame shaped horizontally oriented abrasion 6 2 x 1 8 cm

9       Overlying the left patella are two elliptical superficial abrasions 0.3 cm in greatest dimension each

10      Complete vertical laceration of the midline upper lip with a chip missing from the anterior medial aspect of the upper right central incisor (tooth #8). Beneath the lip is a large area of hemorrhage and soft tissue disruption at the margin of the lip with the maxilla and overlying the central and lateral incisors bilaterally.

## GENERAL EXTERNAL EXAMINATION:

The decedent is a mildly obese Caucasian male appearing consistent with his stated age The body measures 70.5 inches in length and weighs approximately 225 pounds. Rigor mortis is 4+ in the upper and lower extremities and lower jaw. Lividity is blotchy, dorsal and fixed. The body is uniformly cool to touch The hair is mixed gray and brown, predominately gray with bushy sideburns and a relatively unkempt long beard The hair measures up to 20 cm in maximum length There is mild bitemporal male pattern hair loss. The ears are normally placed and are remarkable only for fixed lividity and a trickle of blood into the right external ear canals. No blood exits the ear canal. The eyebrows are thin. Sclerae are muddy Iris color is blue/gray. Conjunctivae are clear. Corneas are clear. Pupils are round and symmetrical and measure 9 mm in diameter. No conjunctival petechiae are identified. The nose is bulbous but shows no evidence of cartilaginous or bony fractures. The long unkempt mustache on the upper lip is blood stained but otherwise unremarkable Examination of the mouth reveals a large central, vertical laceration of the upper lip and soft tissue hemorrhage of the superior maxilla at the margin of the sinuses The neck is short and squat but shows no external injuries. The chest and

6

abdomen are mildly protuberant and palpation of the anterior chest reveals complete bilateral instability  A "C" shaped abrasion is present 6.0 cm distal and 2.5 cm medial to the right nipple. A series of approximately three superficial horizontally oriented abrasions are present beneath the right nipple forming a patch 2.5 x 1.8 cm in greatest dimension. A superficial puncture wound is present immediately distal and left lateral to the xiphoid process of the sternum 0 2 cm in greatest dimension. The cut down site immediately superior to the umbilicus is described above. There is mild ecchymosis of the right flank 12 cm in greatest dimension. The genitalia are those of a circumcised adult male with usual secondary sex characteristics. Both testicles lie within the scrotum. A Foley catheter enters the penis which is tied but the urine collection device has been discarded (against protocol). The extremities are symmetrical in length and muscle mass is above average. No long bone fractures are suspected. Fingernails and toenails are close kept. The hands are modestly callused. No injuries to the hands are appreciated. Examination of the back is unremarkable. Examination of the anus is unremarkable.

## INTERNAL EVIDENCE OF INJURY:

1       Multiple, complex, bilateral rib fractures: right 3-7 at sternal junction, right 2-6 in axillary line, left 3-6 anterior to costochondral junction, left 3-7 at the sternal joint, left 2-5 anterior to the axillary line and left 8-10 at posterior lateral ribcage

2.      Complete horizontal sternal fracture between ribs 5-6.

3.      Marked anterior mediastinal hemorrhage

4.      Small horizontal transmural tear of left inferior pulmonary vein.

5.      Approximately 10 cc of fibrinous intrapericardial hemorrhage.

6.      Severe bilateral pleural hemorrhages, approximately 2 L of unclotted blood in each chest cavity with tense bilateral pneumothoraces.

7       Right lower lobe lung contusion 4.5 x 3.0 x 1.5 cm, left upper lobe contusion 6.5 cm in greatest dimension.

8.      Superficial fractures of the right liver dome and left liver lobe at superior and anterior areas  maximum lacerations 0.7 cm in depth.

9.      Small acute peritoneal hemorrhage, approximately 50 cc, associated with both liver lacerations and splenic lacerations.

10.     Superficial lacerations of splenic capsule, complete horizontal laceration on lateral aspect of mid portion of organ, 4.5 cm laceration of inferior medial portion.

7

11.   Partial evulsion of gallbladder with hemorrhage at gallbladder base.

## GENERAL INTERNAL EXAMINATION:

The chest and abdomen are opened with a Y incision in the usual manner. Both chest cavities are tense with unclotted blood. The pericardial sack is intact but there is intrapericardial, acute fibrinous hemorrhage originating from a small tear in the inferior left pulmonary vein. The abdominal cavity contains a small quantity of blood surrounding capsule tears in the spleen and multiple, complex superficial lacerations of the superior and anterior liver lobes.

Blood taken by paramedics was transported with the body under my direction and will be utilized for toxicology evaluation. In addition, approximately 15 cc of blood is removed from the descending aorta at time of autopsy. No urine is available either from the hospital or at time of autopsy. A Foley catheter is present in the penis but the urine collection device was discarded. The organs are removed and studied.

**Heart:** The heart weighs 505 gm and is mildly enlarged. Left ventricular thickness is uniform and averages 1.0 cm. Right ventricular thickness is uniform and measures 0.3 cm. No distinct left ventricular myocardial scars are appreciated although there is a somewhat mottled discoloration of the anterior and septal left ventricular myocardium. The cardiac valves show normal morphology. The coronary arteries arise in the usual manner but show moderate to focally severe three vessel calcific atherosclerosis. There is greater than 50% narrowing of the left anterior descending vessel and strictures causing up to 80% narrowing are seen in the left mainstem and more distal right coronary arteries. The aorta arises in the usual manner and shows comparatively minimal calcific atherosclerosis. There are numerous small intimal tears in the transverse and early descending portions of the aorta attributed to stretching deceleration injuries. The quantity of blood in the vascular system is substantially below normal. Internal organs are relatively uniformly pale and agonal exanguination and features of hemorrhagic shock are visibly apparent.

**Lungs:** The right lung weighs 765 and the left lung 780 gm. Increased lung weights are due to hemorrhages in the left upper and right lower lobes. Airways are patent and unremarkable. Blood vessels where severed are unremarkable. Parencymal surfaces where cut are largely collapsed with focal intraparenchymal contusions. There is increased anthrocotic pigment deposition in pleural lymphatics and hilar lymph nodes are gray to black.

**Gastrointestinal tract:** The esophageal mucosa is intact and unremarkable. The stomach contains approximately 1.5 L of cloudy, low viscosity fluid with gross smell of alcohol. No food substances are appreciated. The small and large intestines are unremarkable. The appendix is present.

8

**Liver:** The liver weighs 2,410 gm and is mildly enlarged and slightly yellow discolored. Stretching lacerations are seen over the right lobe dome and anterior and superior left lobe. Associated hemorrhage is relatively minimal for the number and depth of superficial lacerations which in aggregate number approximately 20. Sections of the liver not associated with the areas of trauma are grossly unremarkable with the exception of suspected fatty degeneration of hepatocytes. The gall bladder is partially evulsed from the liver with associated soft tissue hemorrhage and edema. Approximately 8 cc of viscous green bile remains in the gall bladder and there are no gall stones. Bile is not retained.

**Spleen:** The spleen weighs 405 gm and shows capsular rupture in the mid portion running horizontally over the lateral surface and in the inferior portion running horizontally toward the hilum

**Urinary tract:** The right kidney weighs 225 and the left kidney 220 gm. Capsules strip with ease. Cortical thickness is uniform and symmetrical, averaging 1.0 cm. No cortical or medullary abnormalities are appreciated. The ureters are intact. The urinary bladder is contracted around the Foley catheter tip and no urine is available.

**Endocrine organs:** The adrenals are intact and unremarkable. The pancreas is intact and unremarkable. The thyroid gland appears normal. The pituitary appears normal.

**Head:** The scalp is reflected in the usual manner. No scalp hemorrhages are identified. The brain is removed and sectioned without fixation. The brain weighs 1,480 gm and is uniformly pale. Normal anatomic landmarks are noted. Cerebrospinal fluid is clear and colorless. No cranial trauma is identified.

## MICROSCOPIC:

**Heart:** Section through the left ventricle, through area of discoloration shows no inflammatory infiltration or fibrosis of myocardium. A section through the left anterior descending coronary artery shows approximately 60% luminal narrowing by subintimal atherosclerosis with calcifications in the plaque. An adjacent smaller arterial branch also shows moderate atherosclerosis.

**Lungs:** Atelectasis, mild emphysematous change, features of partial parenchymal collapse.

**Liver:** Mild to focally moderate fatty degeneration of hepatocytes consistent with alcohol toxicity. Focal subcapsular acute hemorrhage.

**Brain:** Tissue disruption secondary to suboptimal fixation. No diagnostic pathological abnormalities.

9

## TOXICOLOGY:

Blood alcohol determination on autopsy blood quantitates 0.09 gm%. Blood drug screen is negative for opiates, cocaine, amphetamines, PCP, marijuana, methadone, propoxyphene, benzodiazepines, barbiturates or tricyclic antidepressants. No urine is available for testing.

d:\My Documents\M.E. Photographs\2000\A-29-00 [DRIVE_G]




PSN00000 PMP
57 42 Kb
640x480x24(RGB)

PSN00001 PMP
59 49 Kb
640x480x24(RGB)

PSN00002 PMP
59 74 Kb
640x480x24(RGB)





PSN00003 PMP
61 59 Kb
640x480x24(RGB)

PSN00004 PMP
61 59 Kb
640x480x24(RGB)

PSN00005 PMP
58 50 Kb
640x480x24(RGB)





PSN00006 PMP
59 45 Kb
640x480x24(RGB)

PSN00007 PMP
59 11 Kb
640x480x24(RGB)

PSN00008 PMP
59 86 Kb
640x480x24(RGB)





PSN00009 PMP
61 39 Kb
640x480x24(RGB)

PSN00010 PMP
60 30 Kb
640x480x24(RGB)

PSN00011 PMP
62 06 Kb
640x480x24(RGB)







PSN00012 PMP
62 45 Kb
640x480x24(RGB)

PSN00013 PMP
62 45 Kb
640x480x24(RGB)

PSN00014 PMP
62 22 Kb
640x480x24(RGB)







PSN00015 PMP
61 01 Kb
640x480x24(RGB)

PSN00016 PMP
62 45 Kb
640x480x24(RGB)

PSN00017 PMP
59 59 Kb
640x480x24(RGB)



PSN00018 PMP
58 01 Kb
640x480x24(RGB)



PSN00019 PMP
62 46 Kb
640x480x24(RGB)



PSN00020 PMP
62 46 Kb
640x480x24(RGB)



PSN00021 PMP
58 59 Kb
640x480x24(RGB)



PSN00022 PMP
62 46 Kb
640x480x24(RGB)

# Exhibit 2

## CURRICULUM VITAE OF FRED DEL MARVA

Fred Del Marva is a court qualified expert specializing in cases of "Acts of Violence," "Slips Trips and Falls " "Liquor Liability " and "Overall Industry Standards Compliance" in the lodging and foodservice industries. During litigation, his opinions are used to determine the foreseeability of malfeasance and adequacy of security. Since 1986, he has been retained in over 400 cases (plaintiff & defense) in 48 of the contiguous states, Hawaii, Jamaica. Dominican Republic, Puerto Rico, and Grand Cayman and, has qualified in both state and federal courts. His association with prominent law firms (Gerry Spence & Melvin Belli) his consulting as the plaintiff expert in the Las Vegas Hilton Tailhook Case and the Austin, Texas "I Can't Believe It's Yogurt Case, have led to his appearances as an industry expert on numerous national, syndicated, and local television/radio shows (e.g. "Geraldo," " The Reporters," etc.)

He is a licensed private investigator and Chairman/CEO of Food and Beverage Investigations, Del Marva Investigative Group, Special Events Security, and Del Marva Corporation. These companies are retained by the country's leading hotel and restaurant chains and independent operators to perform a variety of surveys including 'Safety & Security," "Quality Assurance," and "Foreseeability Planning for Liability Exposure" Properties are surveyed to determine whether they comply with corporate policies, procedures, and industry standards

Mr. Del Marva is a lecturer, educator and trainer. He is a nationally acclaimed industry expert and an acknowledged authority on standards of care, management training, guest security and policy and procedure development and implementation for hotels, discos, bars, restaurants, sport complexes, race tracks, casinos, convention facilities, and cruise ships

He is certified in Security Professional Training Techniques by the National Association of Investigative Specialists, a certified TIPS trainer for the responsible service of alcohol, a "Neutral Evaluator" for a California Bar Association (ADR), and a member of a Drug and Alcohol Task Force. He served as an Executive Advisory Board Member at two distinguished colleges with Hotel & Restaurant Departments and has been published in hospitality trade journals

He has been in the hospitality industry for over 45 years. Twenty-five of those years as an employee manager, 20 as an industry consultant, and 15 as a liability consultant and liability expert. Having owned and operated numerous businesses the experiences he brings to his training programs, consulting and expert testimony are based on acceptable industry principles and methods needed to insure a safe and secure environment

As part of his continuing efforts to educate, he conducts corporate and military club management training programs, lectures at colleges universities, and hotel and restaurant associations in the United States and Canada. He discloses the mistakes and the successes he has encountered while dealing with the country's leading hotel and restaurant companies, and teaches attendees to develop proactive reactive instincts that lead to the anticipation, recognition, and elimination of potential areas of liability

Hilton Hotel & Casinos. Caesar's Palace Hotel & Casino, Stardust Hotel & Casino, Trump Castle Hotel & Casino, Bally's Hotel & Casino. MGM Hotel & Casino. Mirage Hotel & Casino. San Remo Hotel & Casino. Harrah's Casino, Marriott, Sheraton. Holiday Inn. Wyndham, Westin, Best Western, Radisson. Ramada. Red Lion, Choice, Taco Bell, McDonald's. Kentucky Fried Chicken. Burger King, Pizza Hut, I Can't Believe It's Yogurt, Sizzler. Denny's, Applebee's, Tony Roma's, Carlos Murphy's. Charlie Brown's, Hard Rock Cafe. Bennigan's. Black Angus, Marie Callendar's, 7 Eleven, Shell and Arco are only a few companies where Mr. Del Marva has consulted or rendered opinions in plaintiff and defense litigation
**1985 -- PRESENT (Food and Beverage Investigations)**

Owner of FBI, a California licensed investigative firm specializing in the sport service and hospitality industries. Clients are bars, restaurants, hotels, casinos, sports complexes, convention centers, cruise ships, etc. The company provides spotting and shopping services, property safety surveys, quality assurance inspections, management training programs, security evaluations, beverage management training, and a variety of other industry related services. FBI is retained by its clients to insure that their property and staff are complying with and adhering to company policies, procedures, and industry standards

### 1986 -- PRESENT (Del Marva Corporation)

President of DMC a hotel and leisure time industry consulting firm providing a variety of services specializing in Quality Assurance Surveys, Safety and Security Inspections Risk Management Workshops, Policy & Procedure Development and, Foreseeability Planning for Liability Exposure DMC also provides legal consultation and as President, Mr. Del Marva provides expert testimony for premises liability, premises security and liquor liability litigation

### 1996 to Present (Special Events Security)

SES is a state licensed private patrol company providing security guard services, security guard training, security program development, policy and procedure development, security guard training manual development, and security consulting

### 1986 -- PRESENT (Del Marva Investigative Group)

DIG is state licensed private investigative firm providing general investigative services for a select group of attorneys in civil and criminal litigation. It also provides pre-employment screening and internal theft investigative services for the leisure time industry

### 1980 -- 1985 (Bottom Line Hospitality Consulting)

President CFO and Senior Consultant Bottom Line provided a complete consulting service to hotels and restaurants specializing in management training (all levels), management/work manual development, departmental policy and procedure development, safety and security evaluations, and hiring and firing procedures

### 1971 to 1986 & 1993

Owned (operated and managed) numerous bars, lounges, restaurants, discos, and catering facilities Turf Club, Jockey Club and Club House - 1993, La Scala Restaurant #3 - 1980 to 1985 La Scala Restaurant #2 - 1978 to 1980, Silver Rose Saloon - 1979 to 1980, La Scala Restaurant #1 - 1976 to 1980 Stage Delicatessen & Theatre Lounge - 1974 to 1976 Eatcetera - 1971 to 1974

### TELEVISION, RADIO & PRINT MEDIA (APPEARANCES & INTERVIEWS)

Geraldo Rivera Show --"Deadly Discos
The Reporters -- "Beware of Bouncers"
San Francisco Channel 2 Morning Talk and KSFO Talk Radio ("Hotel Security")
Wall Street Journal
Trade Publications
ABC News

### MAJOR SPEAKING ENGAGEMENTS

University of San Francisco
Washington State University
Golden Gate University
Diablo Valley College
San Francisco City College
California Culinary Academy

## Major Hotel Corporations

Holiday Inn Corporation
Aircoa Hotel Corporation

## Military

Department of Navy

## Legal Associations

Association of Trial Lawyers of America (premises security, casino security & liquor liability)

## State Restaurant & Hotel Associations

Virginia Hotel & Restaurant Association (Richmond)
California Restaurant Association (Los Angeles)
Colorado Hotel & Restaurant Association (Denver)
American Hotel & Motel Association (New York)
Wyoming Hotel & Restaurant Association
State of Washington Restaurant Association (Seattle)
California Restaurant Association (Newport Beach)
Canadian Hotel & Restaurant Association (Toronto)
Wisconsin Hotel & Restaurant Association (Madison)
Missouri Hotel & Restaurant Association (1986 St Louis)
California Restaurant Association (Sacramento)
National Restaurant Association (Chicago)
New Jersey Restaurant Association (Kearny)
Texas Restaurant Association (Dallas)
Michigan Restaurant Association (Detroit)
California Hotel & Motel Association (Sacramento)
Florida Restaurant Association (Orlando)
Mississippi Restaurant Association (Jackson)
Ohio Hotel & Restaurant Association (Columbus)
Missouri Restaurant Association (1994 St Louis)
Ohio Restaurant Association (1996)

## Security Associations

American Society for Industrial Security (lodging security)

## LICENSES, PERMITS & CERTIFICATIONS

CA Licensed Private Investigator (Food & Beverage Investigations -- 1986 to present)
CA Licensed Private Investigator (Del Marva Investigative Group -- 1986 to present)
AZ Licensed Private Investigator (Del Marva Detective Agency – 1998 to 2001)
CA Licensed Security Guard (1986 to present)
CA Licensed Private Patrol Operator (Special Events Security -- 1996 to present)
Certified TIPS (responsible service of alcohol) Trainer
National Association of Investigative Service (Security Professional Training Techniques)
832 P C – Use of Force, Arrest and Firearms
Use of Deadly Force

## PROFESSIONAL MEMBERSHIPS AND AFFILIATIONS

Neutral Evaluator (Alternative Dispute Resolution Section) Marin County Bar Association
Past Commissioner, Novato Drug and Alcohol Commission
Past Chairman of the selection committee for the Advisory Board
Hotel/Restaurant Department) San Francisco City College
Past Executive Advisory Board Member (Hotel/Restaurant Department) SF City College
Past Advisory Board Member (Hotel/Restaurant Department) Diablo Valley College
National Association of Legal Investigators (NALI)
Registered Consultant -- Resolution Trust Corporation (RTC)
National Forensic Center
TASA Technical Advisor for Attorneys
National Expert Resources
American Trial Lawyers Association (ATLA Exchange)
California Trial Lawyers Association (CTLA Data Base)
Legal Research Network
Leisure Time Industries Litigation Consultants Exchange
National Restaurant Association
Past Member, American Society For Industrial Security
California Association of Licensed Investigators (CALI)

## EDUCATION

Northern California Criminal Justice Training and Educational System
        (Santa Rosa Junior College – 1977) Use of Force, Arrest & Firearms
Northern California Criminal Justice Training and Educational System
        (Santa Rosa Junior College – 1987) Use of Force Arrest & Firearms
Anheuser-Busch (Health Educational Foundation) TIPS Program
        'Training For The Intervention Procedures By Servers Of Alcohol"
ATLA College of Advocacy Seminar (Premises Liability & Premises Security)
ASIS, American Society for Industrial Security (Lodging Security Workshop)
National Rifle Association/AZ Dept of Public Safety Use of Deadly Force

## ARTICLES & PUBLICATIONS

Pay Now or Pay Later, Preventing Liability Suits
Implementing Controls, the Secret to Success
Employee Theft Drug Abuse Should Put Restaurateurs on Guard
Theft, The Skeleton in the Food-Service Industry's Closet
4//

Exhibit 3

## Fred Del Marva, PI, PPO

### *OPINIONS REPORT*

January 17, 2002

#### Faust, et al. v Loyal Order of Moose Inc., et al,

This report contains my opinions regarding the principles, procedures, and methods in which the above-captioned defendants' conducted their business at the time of the incident; the defendants' actions and omissions on the date of the incident and whether their principles and methodology were consistent with those of reasonable, diligent, and responsible owners/operators of similar properties with regard to creating and providing a safe and secure environment for their drinking clientele and others with whom this clientele might come in contact. And, whether the defendants' procedures, principles, methodology, or omissions violated any applicable standard of care owed by the defendant to the plaintiffs, and whether such was a proximate cause of the incident in question.

I am aware that additional discovery and investigation of the subject matter of this lawsuit is continuing and not yet completed. For this reason, I reserve the right to add to, amend, modify, or supplement the following opinions after I have had the opportunity to review any additional discovery or results of such investigation.

My opinions are based upon the information provided by you, the documents furnished, analysis performed, interviews conducted, an on-site inspection of the defendant's premises, 45 years of bar and restaurant experience, consulting as a expert in approximately one hundred dram shop cases and owning and operating numerous bars and restaurants. The opinions expressed herein are current and accurately reflect my conclusions to date.

In compliance with the applicable rules of civil procedure in Federal Court, attached are a current curriculum vitae and fee schedule (Exhibit A), a list of documents that reflect the basis for my opinions (Exhibit B), and a list of cases in which I have rendered opinions either at trial or deposition during the last four years (Exhibit C).

Based on my review of the documents produced and the testimonies given in this case, the following is a general overview of the events and is not intended as an exhaustive detailed rendition of all of the facts regarding the incident.

### SUMMARY OF FINDINGS

On April 21, 2000, Mr. Kincaid drove his vehicle, followed by his girlfriend (Alexis Chapman) in her vehicle, to her place of employment, The Moose Lodge, where she was going to be the bartender and the only paid employee on that evening.

James Dezao, Esquire
January 17, 2002
Page Two


Upon his arrival, Mr. Kincaid sat at the bar and because he was a member was allowed to purchase alcohol, which was served to him by his girlfriend Ms. Chapman.

During the approximately three hours that Mr. Kincaid was a patron of the bar, he walked to the kitchen to see what was on the menu for that evening and, most likely made a trip to the restroom.

According to one of Ms. Chapman's statements, between the hours of 7:00 p.m. and 7:30 p.m., Mr. Kincaid did not like what was on the Moose Lodge menu that evening and left the bar to buy some cooked chicken at Coast Cutters which is a supermarket. During my on-site inspection, the grocery store, taking I-5, is approximately 6 miles from the Moose Lodge and it takes approximately 11 minutes to get there.

Ms. Chapman has changed her story three times regarding the times Mr. Kincaid left the premises. The times range from 6:00 p.m. to between 6:00 p.m. and 6:30 p.m. and between 7:00 p m and 7:30 p.m.



It is my belief that at approximately 7:49 p.m. Mr. Kincaid found the deli at Coast Cutters to be closed and the cooked chicken was unavailable. He then left the premises and drove his vehicle into the oncoming lane and collided with the plaintiff's vehicle, injuring all the passengers. The scene of the accident was only one minute from the grocery store on the frontage road.

I am aware that Mr. Kincaid's blood was drawn at approximately 8:49 p.m. and resulted in a BAC of .162. Based on my experience in approximately one hundred (100) dram shop or liquor related incidents, working with toxicologists across the country, my knowledge, background, experience in the hospitality industry, the information reviewed, analysis performed, and my investigation and studies with service of alcohol techniques and training programs for Nevada, Missouri, Mississippi, Washington, New Jersey, Kansas, Tennessee, Illinois, New Mexico, Louisiana, Connecticut, Hawaii, Arizona, and industry approved training programs such as, National Alcoholic Beverage Control Association Alcohol Server Liability; Michigan Licensed Beverage Association "Techniques of Alcohol Management" (TAM); National Restaurant Association "Alcohol Awareness Program"; California Alcohol Beverage Control Board "Licensee Education on Alcohol & Drugs" (LEADS); American Hotel and Motel Association "Serving With Care"; and my past certification in Anheuser Bush "Training for Intervention Procedures by Servers of Alcohol (TIPS), it is my opinion that Mr. Kincaid was obviously intoxicated when his girlfriend (Ms. Chapman) served him his last beverage, was obviously intoxicated when he walked out the front door, was obviously intoxicated when he entered his vehicle and was obviously intoxicated and in a murderous condition when he drove off the parking lot at the Moose Lodge.

James Dezao, Esquire
January 17, 2002
Page Three

While consuming alcoholic beverages at the Moose Lodge, prior to leaving, Mr. Kincaid would have displayed signs of intoxication such as loss of inhibitions, impairment of judgment, impairment of reactions, and impairment of coordination.

Also, due to the intravenous given to Mr. Kincaid prior to his demise, I am of the opinion that his blood was diluted and that his BAC was higher than the .16. This will be substantiated by the plaintiff's toxicologist.

Defense counsel is alleging, based on Kincaid's girlfriend's statement and testimony, that he was not intoxicated when he arrived at work with her and that she only served him two beers at the Moose Lodge. It is obvious to me and scientifically impossible for him to have reached the level of intoxication, as plaintiff's toxicologist will testify, with the consumption of only two beers.

In looking at the accident scene pictures, it appears that the bottle of Black Velvet found in his vehicle did not have enough alcohol missing from it to have caused the level of alcohol detected and, it is very unlikely that he drank straight shots from that bottle because he would never drink Black Velvet unless it was mixed with diet Pepsi. Also, there was no diet Pepsi or drinking vessel found in his vehicle after then accident.

Also, there is no evidence that he drank at any other bar.

Since Ms. Chapman testified that he was sober when he arrived at the Moose Lodge, and he would not drink straight shots in his vehicle, and he was not at any other bar, the only place that he could have consumed the 10 to 12 alcoholic beverages, that would have brought his level of intoxication to where it was, was at the defendant's premises.

## OPINIONS and CONCLUSIONS

It is my opinion that Mr. Kincaid, while patronizing the defendant's premises and being served alcohol by his girlfriend, was displaying obvious signs of intoxication.

It is my opinion that Ms. Chapman deviated from the training she received and violated State requirements by continually serving her boyfriend who was obviously intoxicated long before he left the premises, entered his vehicle and drove out of the defendant's parking lot.

In light of the totality of the circumstances, it is my opinion that the methodology, principles, procedures, and actions employed by the defendants with regard to the

James Dezao, Esquire
January 17, 2002
Page Four

conduct, supervision and training of its employees were **not** consistent with those which would have been employed by a responsible, diligent, prudent, and reasonable operator given the same circumstances

Far worse, in whole, they reflect a gross disregard for the health, safety, and well being of invitees patronizing their premises.

It is my opinion based on my review and analysis of the circumstances and facts relevant to the incident in question, it is my opinion that the Moose Lodge and their employees, breached industry standards, deviated from their own standards, violated state requirements and were both directly and indirectly responsible, in a number of ways and in repeated instances, for the incident in question and the injuries sustained by the plaintiffs.

It is my opinion that on the night of the incident at the Moose Lodge, there existed indisputable circumstances, which created a reasonably foreseeable risk and that such risk, would have been reasonably anticipated by responsible, prudent, and professional operators and their staff. And, that the foreseeability of an incident such as the one in question was sufficient enough to impose a duty to protect patrons from becoming physically and mentally impaired and a danger to themselves and others.

It is my opinion that the type of business the defendant was operating created fertile grounds for the reckless service of alcohol leading to subsequent alcohol related injuries.

It is my opinion that this incident was preventable, and that the conduct and actions of the Moose Lodge and their employees directly and indirectly contributed to the injuries sustained by the plaintiffs.

It is my opinion that the Moose Lodge knew or should have known or in the exercise of reasonable and ordinary care would have known that Mr. Kincaid was obviously intoxicated and posed a danger to himself and others.

It is my opinion that the national organization of the Moose Lodge was negligent by failing to adequately monitor this location to ensure that they were not in violation of state laws concerning service of alcohol to obviously intoxicated members.

It is my opinion that the national organization of the Moose Lodge was negligent by not developing a tool or mechanism that would allow them to ensure that employees of the location were complying with and adhering to the state regulated training programs.

James Dezao, Esquire
January 17, 2002
Page Five

Given that the state medical examiner ruled out natural death and confirmed the extent of alcohol in Mr. Kincaid's body, it is my opinion that his death and the injuries he inflicted on the plaintiffs was due to his intoxication caused by the excessive amount of alcohol that he consumed while being a patron at the defendants' premises.

It is my opinion that the aforementioned conduct of the defendants was careless, reckless, irresponsible, grossly negligent and a blatant disregard for the safety of Mr. Kincaid and with whomever he may come in contact when they allowed him to enter his vehicle and drive off the premises in a "murderous condition".

If you have any question, feel free to contact me

Sincerely,

Fred Del Marva, PI, PPO
FDM:crdm

Exhibit 4

Fred Del Marva, PI, PPO

## *SUPPLEMENTAL OPINIONS REPORT*

February 5, 2003

Faust, et al. v Loyal Order of Moose Inc., et al.

I have recently reviewed a transcript of a recorded statement of Ron Beers, a member of the Moose Lodge and compared it with the deposition of Alexis Chapman

The contents of these documents, along with other documents listed in exhibit B of my January 17, 2003 opinions report, are the basis for my expert opinions.

With regard to Mr. Beers's statement, it is obvious that his observations of Mr. Kincaid at the Moose lodge conflict and do not coincide with Ms. Chapman's testimony.

While Ms. Chapman testified that Mr. Kincaid patronizes the Moose bar once a week, Mr. Beers observed Mr. Kincaid's patronage three to four time a week.

Mr. Beers stated that he always saw Mr. Kincaid drink mixed beverages and never saw him drink beer. This too conflicts with Ms Chapman's testimony.

Mr. Beers stated that he had observed Mr. Kincaid obviously intoxicated while at the Moose Lodge and that at those times Ms. Chapman was the bartender. This too conflicts with Ms. Chapman's testimony (27/11-14).

Mr. Beers also stated that Mr. Kincaid was not the only member that he observed to be obviously intoxicated while being served by Ms. Chapman. Because of this, it is my opinion that the training given to Ms Chapman was either forgotten by her or she intentionally deviated from the way she was trained to serve alcohol responsibly   The training issue is also substantiated in the deposition of Ms Chapman (52/10-11 & 53/12-13) There, she testified that she had **"cut off"** members for being obviously intoxicated prior to this incident. The **only** reason that she would have had to "cut-off" members is that she served them irresponsibly and deviated from her training.

Another discrepancy regarding her training was her testimony that a patron can reach a BAC of .08 with the service of only one drink per hour (52/6-8). If she was aware of that (which is not correct) then why did she serve (based on her own admission) Mr. Kincaid two beers between the hours of 4.30 and 5:30 p.m.?

Other conflicting testimony in Ms. Chapman's deposition is the time that Mr. Kincaid left the defendant's premises. Although she testified it was approximately 6:00 p.m., she previously told Windsor and Hatten investigators that Mr. Kincaid left between 7.00 and 7:30 or it could have been later.

James Dezao, Esquire
February 5, 2003
Page Two

It is also my opinion that the Moose Lodge in this case continued to employ Ms. Chapman who was in a special relationship with a patron who was a regular customer. Ms Chapman, by her own admission was the live-in girlfriend of the defendant Hawkeye Kincaid, paid all his living expenses and gave him money on a regular basis.

She also testified in her deposition that she previously served him at other bars where she worked as a bartender prior to her employment at the Moose Lodge.

The special relationship between the bartender and the defendant Hawkeye Kincaid clearly demonstrates that she was unable to remain objective and exert control over the obviously intoxicated Mr. Kincaid, allowing him to drive immediately after serving him an irresponsible amount of alcohol at the Moose Lodge.

Another area which should be considered is that although the Moose Lodge has the same duty imposed on them by the State of Washington, as do public bars or other liquor licensed premises, it is a members only, brotherhood and fraternal organization where the private sector is not allowed to patronize. It is my opinion, that under those circumstances, it is more likely than not that there would be service of alcohol to members who showed signs of intoxication by a fellow member who is also the bartender. And therefore, the selection of a bartender, the monitoring of that bartender and the supervision of that employee is more important than in a public bar and **was not** done by this defendant which, in my opinion, contributed to the proximate cause of the injuries sustained by the plaintiffs

Taking into consideration this new evidence, it is still my opinion that the conduct of the defendants was careless, reckless, irresponsible, grossly negligent and a blatant disregard for the safety of Mr. Kincaid, and with whomever he may come in contact, when they allowed him to enter his vehicle and drive off the premises in a "murderous condition".

If you have any question, feel free to contact me.

Sincerely,

Fred Del Marva, PI, PPO
FDM'crdm